West courtroom panel. We've got another array of interesting cases. There we've read the briefs and the various other papers that you've submitted. We've been into the record some, but not as much as you have. So your arguments will help us to better understand your arguments and crystallize some of the issues. So when you're at the mic, just stay in the mic talking good and loud so the tape will pick up, because we do record it and we listen to the argument later. All right, that said, we'll call the first case, Police and Fire Retirement System v. Plains. Ms. Alexander, good morning. Good morning, Your Honors. Susan Alexander on behalf of the Retirement and Pension Funds. This is a securities case based on defendants' material and public false statements about the safety and maintenance of Plains pipelines in designated high consequence areas. Because the complaint pleads both 33 and 34 Act claims, the dismissal should be reversed. And I'd like to start by highlighting what I think are the three strongest statements under the Securities Act. So I would turn the Court's attention to Statements 15, 16, and Number 1. Excuse me, 15 and 16 are unqualified statements that Plains was not in violation of any law or regulation. And then Statement Number 1 was specifically focused on pipelines in high consequence areas and said that Plains actually went beyond the regulatory mandate in protecting pipelines in high consequence areas. The truth was really different. So those statements are materially false. Investors would have wanted to know that on two of Plains pipelines, Lines 901 and 903, that were two of the oldest pipelines in the Plains network. They were in the last two years of their maximum usable life. They were running through a high consequence area in the Pacific Ocean near Santa Barbara. Investors would have wanted to know that there was active external corrosion and anomalies that had been under called for the past 10 years. And investors would have wanted to know that quite the opposite of not being in violation of any law or regulation, Plains was in violation of a laundry list of regulations. So the full list is at paragraph 397 of the complaint. I'd like to highlight three violations that make it clear those statements were false. First of all, Plains violated the regulatory requirement that it had to take actual data that it recovered from its excavations of digs and provide that to the vendor of SmartPigs. I didn't know what a SmartPig was and I don't know if you all do, but a SmartPig is the tool that runs through a pipeline to test it and to estimate the anomalies. But the only way that SmartPig works is if you calibrate it with data from actual digs. And so there's a regulation that requires pipeline operators to provide the SmartPig vendor with the actual data from the digs. Plains did not do that in violation of 49, I can read you the numbers, but in violation of the regulations that are listed in our briefs. That's number one. Number two, Plains failed to effectively protect for external corrosion. So Plains deviated from the industry standard and instead, which is again in violation of regulations, and instead used a shrink wrap coating for the exterior of its pipelines, which actually turns out to seal in corrosion, which is why the industry doesn't do it that way. But Plains violated the industry standard and the regulation that says that it should not do that by using the shrink wrap method. The third violation that I wanted to highlight is that Plains did not have automatic shutoff valves. Again, industry standard and everybody else in the Santa Barbara area near the Pacific Ocean had automatic shutoff valves. Plains chose not to. So regardless of the Santa, which we'll get to in connection with the Exchange Act claims, we know those statements were false. And we know they were material because actually those are the violations that I just discussed are lined up exactly with what the safety administration said were the three primary causes of the spill. So we know they were false. We know they were material. And that's all we need to plead under the 33 Act in order to state a claim because it's the very purpose of the 33 Act. The 33 Act was designed to make registration statements a place where issuers have to be really careful about what they say. And they must be specific. And they can't just say, sure, Plains is not in violation of any laws or regulations without that meaning something. Defendants have argued that two of the statements, statements 15 and 16, shouldn't be actionable because they were made in underwriting agreements rather than in the registration statement, the primary registration statement. And the district court reached out, sort of charted new ground, and said and agreed with that argument. The argument's wrong. You're charting some ground yourself, it seems to me. Isn't the sole or least judicial authority you have a district court from Oregon that would make underwriter agreements actionable in this way? I'm sorry, is there judicial authority? What's your best judicial authority besides the district court in Oregon or is it that? Actually, the best authority comes from the securities regulations themselves. So what I'm asking is what is your best judicial authority and is it the district court of Oregon? I would say the best judicial authority is the district court in Oregon and the Second Circuit in the Criscraft Industry case. You're interpreting the Securities and Exchange Commission as indicated. It does seem surprising to me that this is not any case law that so applies it. What's your explanation for why, if we wrote an opinion that agreed with you, we would be one of the very rare opinions that so held? Well, I don't believe there are any opinions going in the other direction. Well, the fact there's one going in your direction or two doesn't seem to be much of a win. The securities laws would certainly strongly support the court in saying that underwriter agreements are a required part of registration statements. So it may be that courts haven't had to address it because it hasn't been questioned. It's a required part of the registration statement. And actually, I would say in this case, I mean, I know you've read the brief, so you know it's a required part of the registration statement and you know that the exhibits are part of the registration statement as well. I don't assume anything. It's good that you reminded me. Okay. I'm glad. Thanks. In this case, there's actually a particular fact. So in this case, the registration statement itself says, I'm going to read it, the underwriter's obligation to purchase Class A shares depends on the satisfaction of the conditions contained in the underwriting agreements, including that the representations and warranties made by Plains defendants to the underwriters are true. So in other words, the underwriting agreements themselves, the registration itself says, the underwriters aren't going to sign this underwriting agreement until they've satisfied themselves that Plains representations and warranties are true. So of course it's part of the registration statement. Of course it is something, I mean, reliance isn't even an element of Section 33, Section 11 claims. But the securities laws say it's part of the registration statement. So I don't think there would be, I think that if this court were to hold otherwise, not only would it be the first circuit court to do so, but I don't think there would be any security, it would be in conflict with the securities laws. Well, the Second Circuit talked about why, because if anything, because underwriters occupy this vital position in the securities process. So if anything, statements in underwriting agreements are almost more meaningful. They're seen as this third party that comes in and verifies the truth, particularly here, as I said, in this case, where there's the specific statement in the registration statement. If the court doesn't have more, absolutely. Why don't you move on with your argument? Okay. So if the court doesn't have more questions about the Securities Act claims, I'll talk about the Exchange Act claims. So all of the statements that are part of the Securities Act claim would also be part of the Exchange Act claim. And then in addition, there are statements, and I would point the court to three additional statements, 3, 5, and 7. Those are the statements that talked about Plains' internal review process to determine if any assets needed additional investment or replacement, the scheduled maintenance, and the fact that Plains used state-of-the-art technologies, tools and technologies, inspection tools and technologies. So the key fact for CENTER is the unity plot. So the unity plot is where Plains employees took the data from the actual digs that we were talking about that is needed to calibrate the smart pig and compared it to the estimates that the smart pig was making when it ran through the pipelines and tested them and found out that the smart pigs were accurate about half the time. About half the time. So the tool's not working, right? Or it's not working half the time. That's key. And then they went ahead and relied on the smart pig data anyway. And the reason that's key is because this court's decision in Berry v. Intervoice said, where the company collects the data that would provide the basis for the correct statement and then goes ahead and speaks falsely anyway, that's enough for CENTER. And so the same situation applies here. And the way we know that Plains knew is because we've identified the three key employees who would have known this. So Mr. Nurbon was the individual who was in charge of the Integrity Management Program. Integrity Management Program is a term of art. It applies to pipelines in high-consequence areas after the 2002 and 2006 amendments to the Hazardous Liquid Pipeline Safety Act. So in high-consequence areas, they have to have these special programs called Integrity Management Programs, and Plains' guy in charge of that is Nurbon. Gorman is in charge of operations, and Valenzuela is in charge of regulatory compliance. What we know about all three of those people is we know that the other thing that the Pipeline Act required was that Plains submit annual reports under the Pipeline Safety Act. Gorman and Valenzuela were the two people who signed that report for Plains. And Nurbon was the person in charge of the Integrity Management Program. So all three of those individuals either knew about the unity plot or were severely reckless in not knowing because that was the specific data that they had to consult in order to complete that form. And this Court's decision in Southland says that their knowledge, which was used, which furnished the information for Plains' report, is Plains' knowledge. Is that your only argument with regard to tying the statements to the individuals? You just mentioned the three people that I think you said would have known this, but I believe the pleading itself doesn't make an attribution to the individual defendants. It sort of says, well, all three of them would know this. Is that correct, or do you have something more to argue on that? I think there's a difference, and thank you for asking. Those three individuals, their knowledge is Plains' knowledge. There are three individual defendants, the CEO Armstrong, CFO Swanson, and COO Pofanis. That's different. But I'm talking about Plains' knowledge. Plains' knowledge is based on those people who were, you know, Plains is a piece of paper, right? I mean, as this Court said in its Kellogg-Brown decision, the corporation acts through individuals, and those were the individuals who were acting on behalf of Plains. So that's Plains, the Plains entity center. The best argument for the individual defendants, the CEO Armstrong, Swanson, and Pofanis, is this. So there are, and again, you know, it's in the briefs that the SEC report said they were given all the material information. There were internal procedures about material deviations. But here's why that's key. When we were talking about the Securities Act, we talked about the fact that the smart pig, their failure to give the information to the vendors was a violation, a deviation from industry norms. Their failure, the way they chose to shrink wrap the pipelines, a deviation from industry norms. Their failure to have shutoff valves, deviation from norms. And the specific internal procedures say that if there are material deviations from industry norms, they have to be approved by two of the four senior executive officers. So Plains' own, I would say that is the strongest fact that says if those are the choices Plains made, we know that two of the four of the individuals had to sign off on it. So I would, yes, Kellogg. I think Kellogg is, again, strong for that because, again, they're acting on behalf of the company. And we know that they signed SOC certifications. There was also an audit. The audit committee charter required that quarterly reports go to those, to the audit committee, and Armstrong, which went to the board, and Armstrong sat on the board. So there were plenty of opportunities for them to get this information. But I think the fact that their signatures were required on material deviations is the strongest fact for Sienter. If the Court doesn't have further questions, I'll see you on rebuttal. Okay. All right. Thank you. Thank you so much. All right. Mr. Holmes. Good morning. Morning. I'll be speaking for 15 minutes on behalf of the Plains defendants, and then Underwriters Council will be speaking for five minutes. Let me start by putting a few things in context. I know it's in the briefing, but I just want to make sure to underscore a few things. Plains operates a 17,000-mile pipeline system across the U.S. Every single one of the, well, let me say it this way. This case relates to a spill that occurred in May 2015 on a 10-mile section of the entire 17,000-mile pipeline system. It was in a high-consequence area. As the district court properly found, every single one of Plains' statements that are at issue here relate to Plains' entire 17,000-mile pipeline system. And I'll talk about Statement 1 in a second, which counsel said was related only to high-consequence areas. All of the statements, with the exception of the three post-spill statements, which were not one of the six statements that counsel just talked about, are all statements of our pipeline system substantially complies. We believe that our pipeline system is in good working order. That's not an exact quote. I'm summarizing what the statements are. We use smart pigs. We have processes in place for the entire pipeline system, not just Line 901. There's not a single public statement about Line 901 until the post-spill, and there's not a single public statement about high-consequence areas. Plaintiffs, while they are quick to point out that Plains says, for example, we have these good processes and programs in place, and we believe that we have good processes and programs in place, they omit the context. Plains operates a pipeline system. It's not an accident that the regulator, PHMSA, is Pipeline and Hazardous Materials Safety Administration. The main regulation at issue is the Hazardous Liquid Pipeline Safety Act. It is not an industry that you're not going to have spills or leaks in. In fact, Plains makes that very clear in their public filings and in the disclosure, which is repeated throughout all of the disclosures. Let me just read it. This is the record at 3384. Although we believe that our efforts to enhance our leak prevention and detection capabilities have produced positive results, we have experienced and likely will experience future releases of hydrocarbon products into the environment from our pipeline. As Judge Rosenthal correctly observed, it's unremarkable that a pipeline would have regulatory issues. It is, as Plains disclosed, unfortunately a byproduct of being engaged in this business, which the investors all knew. Now, let me turn to a couple of counsel's arguments. Number one, I think the three strongest were listed as 1, 15, and 16. And number one was represented and was argued in the court below to be related only to high-consequence areas. Judge Rosenthal rejected that argument because the plain text of that statement is the DOT regulations include requirements for the establishment of pipeline integrity management programs and for the protection of high-consequence areas. The DOT regulations at issue, they cover all of Plains' pipeline system, including the high-consequence areas, but it's not limited to the high-consequence areas. More than that, Plains did not say, as the plaintiffs and appellants would have the court believe, that we go beyond regulatory mandate in high-consequence areas. It's different. The actual statement, and that's really what's missing in this case in the analysis, what the Fifth Circuit law requires, and I think universally among all circuits, is a statement-by-statement analysis that depends on the text of the statement and looking at the facts at the time of the statement that show that the statement was false and misleading and with respect to the 10B statements that the speaker acted with the requisite scienter. There's none of that in the complaint. There's none of that. Let me ask you about that section of Statement 1. We have developed and implemented certain pipeline integrity measures that go beyond regulatory mandate. Is it your point that that is too ambiguous, that it's not clearly talking about anything in specific, or what are you really saying about why that itself is not a misstatement, that particular sentence? Well, I mean, I don't know. My initial reaction to it is it's unclear to me exactly what it's talking about and what category of regulation. But I don't think that's the way Judge Rosenthal looked at it. I think that's one of the ways Judge Rosenthal looked at it, and I think that it wasn't perhaps the primary way. I think Judge Rosenthal's primary analysis for each of the statements is you have a specific, just taking plaintiff's allegations for what they are, you have a specific operational failure at one point in time on a pipeline. Because even as this Court has held, even if a plaintiff has pled mismanagement, that is not securities fraud. That falls far short of securities fraud. So saying, on the one hand, we have also developed and implemented certain integrity measures that go beyond regulatory mandate, that is talking about all of the regulations, which there are a lot of regulations. It's a heavily regulated industry. It's not focused on high-consequence areas. It's not focused on line 901. It's not even focused on smart picks. It says we have developed certain regulatory measures that go beyond regulatory mandate. Plaintiff's complaint has, as we heard in the argument, is tied to issues on line 901, and these issues were identified in a PHMSA post-spill report that came out. There's no contemporaneous documents at the time of any of these statements that tie knowledge or even any kind of recklessness type of scienter to any of the individuals. So on that particular statement, there's nothing in the complaint that suggests that that's untrue. And what happened on line 901, that statement could be true. Let me say it this way. That statement could be true even if there were some regulatory measures that weren't quite up to snuff, and I think that's one of the ways Judge Rosenthal looked at it. Now, the other two are statements 15 and 16, which are the, as counsel said, were unqualified statements. I disagree with the characterization that they're unqualified statements. To put it in context, and I think as the court understands, these are reps and warranties that appear in underwriting agreements that are required to be attached to offerings. They're required to be attached so that the market can see what the terms were of that agreement. Holding the terms in a contract are equivalent to statements in a public filing and therefore can have liability would vastly expand the securities laws. Companies have to attach material contracts to their 34-Act filings, their Ks and their Qs. In proxy filings on a merger, you have to attach certain contracts. You have to attach the merger agreement. So to hold the contract, there is no case law suggesting other than this Galena case from the District of Oregon that statements in those contracts can be actionable. Of course, if you attach the wrong contract or you altered the terms of the contract, that would be a different story, but we're not talking about that. The opposing counsel says if we say the opposite, that they are not actionable, that we would revolutionize how this whole system is supposed to work. Not her words, but basically it would be a huge change in the expectations. And here's why that's so problematic is because a contract is a holistic document. You can't just pull one term out of a contract and say this term means X as an investor. It has to be judged in light of the entire contract. And the one provision, and so to put that into play here, a rep and warranty in an agreement, in an underwriting agreement, is tethered to an indemnity. It is a risk allocation between the underwriter and between the issuer. And as Judge Rosenthal pointed out and relied upon, these agreements, it's not just, I would say that our argument, these aren't the facts of this case, but even if the contracts didn't have language limiting the intended audience, I still think it's correct that statements in contracts or provisions in contracts aren't statements for purposes of securities laws. But in the underwriting agreements, there's a term in the contract that says the underwriting agreements were made solely for the benefit of the several underwriters and no other person shall acquire or have any right under or by virtue of this agreement. That has to be correct. Imagine a situation where a shareholder says I think a provision underwriting agreement means X and the two parties to the underwriting agreement says that's not at all what it means. Or imagine a situation where there's a securities lawsuit based on the meaning of a provision that's disputed between the parties to the agreement, like a merger agreement, an underwriting agreement, a material contract, and a court adjudicating that matter says no, that's not at all what it means. So one, I would say it's legally there's no basis for it. Two, I think when you look at the plain terms of this contract, it says it's solely limited to the underwriters and no other person shall rely upon it. And three, I think the practical implications of expanding the securities laws in this way are rife with difficulties. We don't have an explanation of why this issue has not been addressed in previous opinions beyond a stray one? Well, I've actually thought about that, and there's part of me that thinks it's a lot of time. He says it's self-evident is why it's not. You're saying it's self-evident the other way. I have several reactions to why it's not. I think that it's a novel and somewhat desperate argument. I don't think other plaintiffs have made it. I think, on the other hand, it's nice as a securities litigator in these cases where the issues seem to repeat themselves to have something new. But I don't think the court actually even needs to get to the legal issue because it's not unqualified. The statement is not just there are no regulatory violations anywhere. There are no regulatory violations that could reasonably be expected to lead to a material adverse event. In the dismissal opinion of the amended complaint before the court, which was the plaintiff's second bite at the apple, there was an original very thorough opinion by Judge Rosenthal. The plaintiff's repled, and there's another very thorough opinion. The judge reconsidered her rulings on these statements and didn't get to, because legally determined they weren't actionable, didn't get to whether they had pled falsity. The appellants say, well, there were three violations at issue, all related to line 901, which were found in the PHMSA report post-spill, that caused those representations in the underwriting agreement to be false and misleading. They don't say on the date of the representation they could have reasonably been expected to lead to a material adverse event. As we explained in the briefing, material adverse event is a term of art. It is defined largely by Delaware case law, and until about six months ago, no Delaware court had ever seen one. It requires something that fundamentally changes the value of a business, fundamentally changes a business. It's not the materialization of a known risk. So you're arguing that this is a proportional, it needs to be evaluated proportionally. Is that correct? My argument is it's not just enough to have a regulatory violation to plead falsity of that representation and warranty. You would have to show that it's a regulatory violation that at the time of that representation would reasonably be expected to lead to a material adverse event, and the complaint fails to do that. May I ask you about Statement 17? That was a website statement. Yes, Your Honor. Wasn't that statement, in fact, false with respect to lines 901 and 903? I don't believe so, and here's why. Let me make sure I understand. I apologize if I don't understand your question perfectly, but it's a belief statement about all of the 17,000 miles of pipeline. It's not directed to line 901, okay? That's first. It's a statement about the whole 17 miles. Yes, and if a textual analysis of each of the alleged misstatements shows that all of the alleged misstatements are about the entire pipeline system, with the exception of the three post-bill statements, which counsel didn't raise and are more than adequately briefed, and so I won't talk about them. But then the second answer is a belief statement. That's a belief statement. There is no allegation in the complaint that ties knowledge of any of these regulatory issues to the four individual defendants. As Your Honor noted, there's no allegations that even tie it to the non-defendant individuals that the appellants say would have known. Your Honor, I see my time's up. I will yield to my colleague. All right, thank you. Thank you. This one? Good morning. I'd like to talk about Statements 15 and 16. We've had some discussion about these two statements already, and I want to talk about them from the unique perspective of the underwriter defendants. From the point of view of the underwriter defendants, plaintiffs' attempt to base a claim on reps and warranties in an underwriting agreement truly is remarkable and truly is unprecedented. The precedent that plaintiffs have cited is the Galena decision out of Oregon. That's a 10-B decision. The issues that come up under Section 11, which has a larger universe of defendants, including underwriters, were not discussed in Galena. Galena is factually distinguishable in various ways, too, but I think what's most important here is it's a 10-B case, and what plaintiffs are asking for, for the first time, is that Section 11 liability be extended beyond the registration statement itself to third-party contracts that are attached as exhibits to a registration statement, or, more precisely, not attached as exhibits, but filed days after the offering as attachments to current reports under SEC rules. Plaintiffs have relied on Section 27 of the 1933 Act, which is simply a schedule of exhibits, and they say the plain meaning of Section 27 is that everything in the exhibits comes within the scope of the liability provisions of the 1933 Act. That's not what the text of the statute says. Again, it's a schedule. It's silent about liability. And as Mr. Holmes has already outlined, the idea that you could base liability on any contract, any term in a contract made by either side would vastly distort the 1933 Act. Let me ask you this, and I'm going beyond the specifics of the argument, but it does seem to me these are relied upon by investors, whether they should be or should not be. But they're out there. Investors are making decisions in part on the underwriting assertions. Whether you agree with that, well, let me ask. That would take evidence in the record to say whether that's true or not. So maybe it's not really part of this case. But it seems to me your principal argument is the statute just doesn't support, either Act really doesn't support creating liability in this situation, regardless of what investors may be doing out there in reliance on such agreements. Well, I think I would take that in two steps. The first step is I do think, as a statutory matter, liability simply doesn't extend to these exhibits. And it certainly doesn't extend to the underwriters, who were not the makers of the representations, but the parties who elicited the representations. But if you pass by that threshold legal issue, you get to the place where Judge Rosenthal started. And what Judge Rosenthal did, I think, is more or less assumed that these statements are actionable. And she then proceeded to analyze them the way you would analyze any other actionable statement, which was in context, looking at the words of the statement, looking at the words that surrounded the statement. And she did look at the issue of investor reliance. And she, I think rightly, acknowledged that there were two sets of statements about legal compliance, right? There were the investors-facing statements that were actually in the text of the 10-Ks that were incorporated by reference into the registration statement. Those investor-facing statements about legal compliance were carefully hedged. The words, I believe, we believe, were used. The word substantial was used to qualify compliance. Those are the statements on which the investors are invited to rely, because they're directed to the investors. Now you have the second set of statements. They're not directed to the investors. They're in a third-party contract. They're phrased differently. They're not absolute, the way plaintiff's counsel suggested, because they do have that material adverse effect limitation. But they are phrased differently because they play a different function in that contract. Investors can look at those, too. Again, they're not going to be looking at them until after they've bought their securities, because the contracts aren't filed until afterwards. And what they'll see if they look there is what Judge Rosenthal saw, which was language saying, this is not for your benefit. This is not a statement that is being made to you for you to base a claim on. This is a statement that is made solely to govern matters between the two parties to the contract, and you are not one of those parties. Do you agree that if we wrote an opinion towards the effect that you just gave us and said that is the law, we would be the first circuit court so holding, so announcing? If you were to follow Judge Rosenthal's analysis and start at this point of reading the statement in context, you would not be the first court to be ‑‑I don't think you would be making new law. Because she's the first court or because someone else? Not the same because she did it. I think the idea of looking at statements in context, interpreting statements in context, that's not new. If you backed up and looked at the question, leave context aside, just baldly are reps and warranties and underwriting agreements fair play under Section 11? You would be the first court making new law on that. And I think there's a reason that there is not a body of law on that already, which is that the claims don't make sense. And, again, particularly from the perspective of the underwriters, they don't make sense. The idea that a party to a contract would be liable for the statements of its counterparty, for the reps and warranties of its counterparty, it's nonsensical and it would also really have very troubling policy implications for the underwriters' due diligence. I mean, the diligence that the underwriters do, they elicit these statements from the issuer so they can improve the investor‑facing statements that the issuer makes. If an issuer were to balk and say, I don't want to represent and warrant that, then the underwriter would turn around and say, well, let's see what you're saying to the investor on this subject. If you're not going to represent this to us, maybe we need to adjust and soften the statement that you're making to the investor. There would be a huge disincentive for underwriters to participate in that kind of work if they were told that the reps and warranties that they elicit from issuers could be turned around and used against them as the basis for a Section 11 claim. Thank you, Counsel. Thank you very much, Your Honor. Thank you. All right. Back to you, Ms. Alexander. Thank you, Your Honor. I'd like to address a couple points about the underwriter agreements and then speak about materiality. So a lot of the conversation about underwriter agreements seems to be focusing on reliance, and I want to emphasize that for a Section 33 Act claim, reliance is not an element. So to be clear, 52 Fed Reg 21252-01 definitely says that exhibits to the registration statement are part of the registration statement. We know that based on what we have briefed that the timing is also irrelevant. All of the documents that are available at the date the security transaction closes are considered to be part of the registration statement. So the timing argument is also not appropriate. But none of it matters in a context of reliance. There is no reliance requirement. The 33 Act laws are absolute liability for false statements. And I think the reason that this Court doesn't have to reach the bottom line legal question, if the Court so chooses, is because this case has an unusual fact. And I'm going to go back to that statement. It's at ROA 3496-97. In the registration statement, there's that statement that I read before which says, these deals aren't going to close until the underwriters have determined that the reps and warranties made by planes to the underwriters are true. So there's an additional assurance here that doesn't always exist in underwriting agreements, an unusual fact. Is it agreed, or maybe it didn't come up as an unusual fact? It doesn't sound particularly surprising there would be such a limitation. Is there anything in this record that says that's a rare contract provision? There's not. There is not. But this isn't, again, this isn't a contract claim. So it's not about the, and to answer your question, I don't know. You can keep going. But this isn't a contract claim. This is a question. It's a securities claim. And the question is, what are the statements in the registration statement? And Statements 15 and 16, which the District Court said absolutely had a material adverse effect, given the consequences of the largest oil spill in California in 25 years. Those statements, if they are false, give rise to absolute liability for issuers and underwriters. There's no reliance element. I also want to briefly address materiality. Because there's been a lot of discussion about how many miles of pipeline planes has. Pipelines we're talking about constitute just about 10% of planes pipelines in high consequence areas. And, actually, there's a fact CEO Armstrong said, and I know you know this from the brief, said if there was one place in the world where you wouldn't want to have an oil spill, it would have been Line 901. Well, if that's the case, that certainly answers the question on materiality. And 10% of the high consequence areas is also a very strong indication of materiality. Materiality is a fact-bound decision that is typically not appropriately decided at the motion-to-dismiss stage. And here there are really strong facts to suggest that the safety and maintenance of these particular pipelines was extremely material. And investors would have wanted to know that actually planes was violating a series of regulations and not maintaining those pipelines in a safe manner. And to be clear, counsel described this as an operational failure. It was not an operational failure. It was a process failure. Planes procedures in not providing vendors with the data to calibrate the smart pigs, in using shrink wrap against industry standards, and in not having automatic shutoff valves, those are process decisions which made those pipelines unsafe. Unless the court has further questions, I thank you for your time. Thank you, counsel, from both sides, for the briefing and the argument. The case will be submitted.